***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Dollar and the briefs and arguments of the parties. The appealing parties have not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award, except with modifications to the calculation of plaintiff's average weekly wage and other minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. Legion Insurance Company, which is insolvent, was the carrier on the risk. The N.C. Insurance Guaranty Association is its successor in interest.
3. The employee-employer relationship existed between the parties at all relevant times.
4. Plaintiff sustained two admittedly compensable injuries to his left ankle. One occurred on December 8, 2000, which was assigned I.C. File Number 132947. The second occurred on March 30, 2001 and is assigned I.C. File Number 134267.
5. Defendants paid temporary total disability benefits to plaintiff at the rate of $346.68 per week from December 8, 2000 to March 30, 2001. Defendants paid temporary total disability benefits to plaintiff at the rate of $495.81 per week for the period from March 31, 2001 to the present.
6. The issues for determination are:
a. Do defendants owe plaintiff temporary total disability benefits at a higher rate than paid for the period from December 8, 2000 to March 30, 2001?
b. Is plaintiff permanently and totally disabled?
c. Should plaintiff be required to continue vocational rehabilitation?
d. Will plaintiff require ongoing medical benefits for his compensable injuries?
e. Is plaintiff entitled to have defendants pay for YMCA membership?
f. Is plaintiff entitled to be paid at a higher compensation rate?
 ***********
Based upon all of the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was thirty-three years old. He obtained his GED and attempted to pursue additional community college course work in computer science at Mitchell Community College. He holds a valid driver's license and has also held a commercial driver's license for prior employment.
2. Plaintiff was involved in a motorcycle accident in 1995 in which he sustained a broken left ankle, which required surgical repair with hardware implantation. He had additional surgery for removal of the hardware. He also has a prior back injury and prior right knee surgeries.
3. Plaintiff has prior work experience as a heavy equipment operator and in commercial painting.
4. After approximately 1998, plaintiff enrolled in five classes at Mitchell Community College. However, he withdrew before the end of the semester.
5. In early 2000, plaintiff began working for defendant-employer, a sheetrock delivery and installation company. When initially hired, plaintiff had lost his driver's license due to a reckless driving conviction. However, when he was able to have his driving privileges restored, plaintiff obtained a CDL; and the employer assigned him to drive a truck with a trailer to deliver sheetrock.
6. On December 8, 2000, plaintiff was delivering a load of sheetrock to a residential construction site. As he was carrying sheetrock, his left ankle rolled.
7. Following the compensable injury, plaintiff was treated at Carolina Primary and Urgent Care. Later, Dr. James Mazur diagnosed him with an avulsion fracture of the left ankle and a left ankle sprain. A CAM walker was ordered, and plaintiff was placed on modified duty with restrictions of twenty-five pound lifting, limited walking, squatting, kneeling and climbing. By February 28, 2000, Dr. Mazur diagnosed him with a ruptured medial collateral ligament and an ankle brace and therapy were ordered.
8. On January 10, 2001, orthopedic surgeon Dr. Mark B. Williamson injected plaintiff's left ankle. He noted plaintiff's x-rays revealed post-traumatic changes with an evulsion fracture at the tip of the medial malleolus.
9. Beginning on January 25, 2001, physical medicine and rehabilitation specialist Dr. Jerome T. Watson initiated a course of physical therapy and work hardening. By March 1, 2001, plaintiff reached maximum medical improvement, was released and in fact did return to unrestricted work, as of March 12, 2001 at the same or greater wages.
10. On March 30, 2001, plaintiff sustained a second left ankle injury when he slipped and rolled the ankle while carrying sheetrock at a muddy job site in Cornelius.
11. Following the second injury, plaintiff returned to Dr. Watson for treatment. An x-ray revealed three small fragments in the ankle and a fracture of the distal fibula.
12. Dr. Williamson evaluated plaintiff on April 4, 2001, following which he injected the ankle with pain medication for the ankle sprain.
13. Dr. Watson began additional therapy. A CT scan on June 4, 2001 indicated a widening of the interosseous joint between the left tibia and fibula.
14. By June 25, 2001, Dr. Williamson recommended surgery with insertion of a syndesmotic screw in the left ankle mortis. He referred plaintiff for a second surgical opinion with Dr. James Seibold of Charlotte Orthopedic Specialists, who did not recommend surgery. Plaintiff decided against the surgery.
15. In October of 2001, Dr. Watson informed plaintiff that he could not return to work in the prior capacity as a result of his left ankle injuries.
16. Plaintiff reached maximum medical improvement from the March 30, 2001 left ankle injury, and he retained a thirty percent permanent partial impairment.
17. Dr. Watson issued permanent restrictions of no lifting over twenty pounds; no heavy physical labor; no work that required climbing, a lot of walking, and any repetitive left ankle motion.
18. Dr. Watson has continued to treat plaintiff for left ankle pain through September 29, 2003.
19. Since March 4, 2002, Dr. Watson has recommended vocational rehabilitation for plaintiff.
20. Dr. Watson is of the opinion that plaintiff would benefit from water therapy, such as that available from the YMCA.
21. On October 28, 2002, defendants began to provide vocational rehabilitation with Rehabilitation Management, Inc., (RMI), who assigned Lew Drumm to assist. Plaintiff has cooperated with job search activities as provided by Mr. Drumm.
22. Plaintiff provided information to Mr. Drumm from which RMI staff typed a résumé. However, the résumé has typographical, grammatical and punctuation errors, which would not be beneficial to plaintiff in seeking work and would not make a favorable impression with potential employers.
23. Mr. Drumm has administered achievement testing which indicates plaintiff is able to read and do mathematics at high school level. He spells at a fifth grade level.
24. Although Mr. Drumm has identified job leads, he has not prescreened any of the job openings before sending plaintiff to apply to determine if the jobs are within the permanent restrictions. Therefore, although plaintiff is applying for numerous jobs, they are not within his restrictions. Plaintiff would benefit from a more personalized job search, which identifies suitable work for his efforts.
25. On November 12, 2002, Mr. Drumm recommended plaintiff return to college for retraining. However, plaintiff became quite angry, and Mr. Drumm then concluded college retraining was not an option.
26. Despite his representations to the contrary, plaintiff clearly would benefit from retraining to help develop skills to facilitate his employability.
27. An additional impediment to plaintiff's employability is his extensive record of criminal convictions, including driving while impaired, possession of illegal narcotics, breaking and entering, and probation violation. The vocational counselor should work with plaintiff to facilitate a determination as to whether any of these convictions may be expunged, thereby reducing this barrier to employability.
28. Plaintiff retained vocational counselor Maria Vargas on October 13, 2003; however, she never met with plaintiff, did not accurately review the records in this case, and did not perform a job search or other services. Therefore, little weight is given to her opinion.
29. The Form 22 submitted by the parties shows the dates worked from April 2000 through March 2001. Before the December 2000 injury, plaintiff worked 244 days from April 3, 2000 through December 12, 2000 [April 2000-28 days (plaintiff began on April 3, 2000); May-31 days; June-30 days; July-31 days; August-31 days; September-30 days; October-26 days (Plaintiff was out more than 7 consecutive days); November-25 days (plaintiff returned on November 6); December-12 days]. According to the calculations, plaintiff earned $26,988.27 for the year 2000. Thus, for the December 2000 injury, plaintiff's correct average weekly wage is $774.27 and his compensation rate is $516.21 ($26,988.27 / 244 = $110.61 x 7 = $774.27 x 0.6667 = $516.21).
30. Plaintiff returned to work March 12, 2001 and again injured his left ankle on March 30, 2001. Although, the Form 22 does not reflect plaintiff worked that day, according to the Form 19, the Form 60, the testimony and the briefs and arguments of the parties, plaintiff sustained an injury by accident while he was working on March 30, 2001. Before the March 30, 2001 injury plaintiff worked 263 days from April 3, 2000 through March 30, 2001 (244 days + 19 days = 263 days). Plaintiff earned $1,166.63 in March 2001 thereby increasing his earnings from April 3, 2000 to March 30, 2001 to $28,154.90. Thus, for the March 30, 2001 injury plaintiff's correct average weekly wage is $749.35 and his compensation rate is $499.59 ($28,154.90 / 7 = $107.05 x 7 = $749.35 x 0.6667 = $499.59).
31. Defendants paid temporary total benefits to plaintiff at a compensation rate of $346.68 from December 8, 2000 to March 30, 2001, which is $169.53 per week less than the correct designated compensation rate indicated above.
32. Defendants paid temporary total benefits to plaintiff at a compensation rate of $495.81 from March 31, 2001 to the present, which is $3.88 per week less than the correct designated compensation rate indicated above.
33. Defendants are entitled to a credit for the benefits paid from March 12, 2001 to March 30, 2001 as plaintiff had returned to work at his pre-injury wage.
 ***********
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. In order to qualify for compensation under the Workers' Compensation Act, a claimant must prove both the existence and the extent of disability. Hilliard v. Apex Cabinet Co., 305 N.C. 593, 290 S.E.2d 682
(1982). In the instant case, plaintiff is potentially employable and even Dr. Watson has recommended vocational assistance and retraining to help him regain wage-earning capacity under I.C. 134267. Thus, plaintiff has failed to carry the burden of proof to establish that he is entitled to permanent and total disability benefits for the December 2000 injury or the March 2001 injury under N.C. Gen. Stat. § 97-29.
2. The method of calculating plaintiff's average weekly wage which is just and fair to the parties is to divide his actual earnings by the number of days worked. N.C. Gen. Stat. § 97-2(5).
3. Under I.C. File Number 132947 for the December 2000 injury plaintiff is entitled to the difference between his temporary total disability compensation at the weekly rate of $516.21 and $346.68, the amount paid by defendants for the period from December 8, 2000 to the March 12, 2001, i.e. $169.53. N.C. Gen. Stat. § 97-29.
4. Defendants are entitled to a credit for benefits paid from period March 12, 2001 until March 30, 2001 when plaintiff had returned to work at his pre-injury wage. N.C. Gen. Stat. § 97-42.
5. Under I.C. File 134267 for the March 2001 injury plaintiff is entitled to temporary total disability compensation at the weekly rate of $499.59 from March 30, 2001 and continuing until plaintiff returns to work or until further order of the Commission. Defendants have been currently paying at a rate of $495.81. Therefore, plaintiff is entitled to the difference in the amount of $3.88 per week since March 30, 2001 until the correct total amount is paid. N.C. Gen. Stat. § 97-29.
6. Under I.C. File 134267, plaintiff is entitled to have defendants pay for medical expenses incurred or to be incurred as a result of the compensable injury as may be required to provide relief, effect a cure or lessen the period of disability. N.C. Gen. Stat. § 97-2(19). This includes future left ankle surgery as may be ordered by Dr. Williamson. In addition, plaintiff would benefit from water therapy. N.C. Gen. Stat. §§ 97-25 97-25.1.
7. Under I.C. File 134267, plaintiff would benefit from additional vocational assistance, including possible retraining and tutoring to lessen his period of disability, pursuant to N.C. Gen. Stat. § 97-2(19).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved, for IC File Number 132947 defendants shall pay plaintiff the difference, i.e. $169.53, between the correct compensation rate, which is $346.68 and the amount paid by defendants from December 8, 2000 through March 12, 2001. Such amount has accrued and shall be paid in a lump sum subject to defendants' right to a credit.
2. Subject to a reasonable attorney's fee herein approved, for IC File Number 134267 defendants shall pay plaintiff at the weekly rate of $499.59 from March 30, 2001 and continuing until plaintiff returns to work or further order of the Commission. Since defendants have been paying at a rate of $495.81 per week, plaintiff is entitled to the difference, i.e. $3.88 per week, from March 31, 2001 until the date defendants begin paying at the correct designated compensation rate of $499.59. Such amount as has accrued shall be paid in a lump sum.
4. Under I.C. File 134267 defendants shall pay medical expenses incurred or to be incurred when bills for the same have been approved, in accordance with the provisions of the Act, including such future treatment as Dr. Williamson may prescribe. Defendants shall pay for water therapy, such as that which may be provided by the YMCA or other locale.
5. Under I.C. File 134267 defendants shall provide vocational assistance to assist plaintiff in developing such job skills may be necessary to lessen his period of disability. Plaintiff is ordered to cooperate with these vocational efforts.
6. Plaintiff's claim for permanent and total disability benefits is, and under the law must be, DENIED.
7. A reasonable attorney's fee of twenty-five (25%) percent of compensation due plaintiff under Paragraph 1 and Paragraph 2 of this AWARD is approved for plaintiff's counsel and shall be paid as follows: twenty-five (25%) percent of lump sum due plaintiff under Paragraph 1, Paragraph 2 and Paragraph 3 of this AWARD shall be deducted from that sum and paid directly to plaintiff's counsel. In regards to future compensation, plaintiff's counsel shall receive every fourth check.
9. Defendants shall pay the costs. Further, defendants shall pay the court reporter costs incurred for the taking of the deposition of Maria Vargas. In addition, defendants shall pay an expert witness fee of $200.00 to Maria Vargas.
This the 22nd day of December 2004.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/____________ BUCK LATTIMORE CHAIRMAN
DCS/llc